IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 09-20269 Ml/P |
| CASSIE CLEMMONS, | ) | |
| | ) | |
| Defendant. | ) | |

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS
_____

Before the court by order of reference is defendant Cassie Clemmons's Motion to Suppress. (D.E. 23.) Pursuant to the order of reference, the court held a suppression hearing on the motion. At the hearing, the court heard testimony from Detectives Otis Edwards and Michael Gibbs with the Memphis Police Department, Antoine Clemmons, and Bernard Clemmons. The court admitted into evidence two photographs of the firearm seized from the vehicle occupied by the Clemmonses and a police report relating to the arrest of Cassie Clemmons.

The court hereby submits the following proposed findings of fact and conclusions of law, and recommends that the motion to suppress be denied.

I.   PROPOSED FINDINGS OF FACT

The court, having had the opportunity to observe the witnesses as they testified at the hearing, finds the testimony of the

detectives to be credible.  To the extent the versions of the events testified to by Antoine and Bernard Clemmons contradict the testimony of the detectives, the court finds the Clemmonses' testimony to be not credible.

On the morning of July 1, 2009, members of the Memphis Police Department's Organized Crime Unit ("OCU"), including OCU Detectives Otis Edwards and Michael Gibbs, were advised during a daily briefing that a woman had been murdered the night before near the 2700 block of Browning Avenue, in south Memphis.  Detectives Edwards and Gibbs knew the Browning Avenue area to be a high crime area, especially for firearms-related crimes.  Due to concerns that more violence could erupt from retaliation for the murder, members of the OCU were directed to "saturate" the area where the murder occurred and to be on the lookout for any suspicious activity.[1]

At approximately 11:00 a.m., Detective Edwards, who was dressed in plain clothes and driving alone in an unmarked police vehicle, drove to the Browning Avenue area and was traveling southbound on Pendleton Street when he observed a Ford Contour

---

[1]The OCU detectives were briefed that

> there had been a female shot in the Browning area, 2700 block area, and told us to be – that's the area where we were to work and told us to be on the lookout for the suspects who might have been doing the shooting.  And there had also been a rumor that there might be some sort of retaliation.  And just for our safety and to be aware of everything that's going on in that area.

(Tr. at 81.)

-2-

traveling towards him northbound in the opposite lane.  As the Contour approached, it swerved into Detective Edwards's lane briefly, almost colliding with the detective's vehicle.  He immediately turned around and followed the Contour.  As he followed the vehicle, he observed it continuing to swerve in and out of its driving lane.  Because Detective Edwards was driving an unmarked police vehicle without emergency "blue" lights, he was not able to initiate a traffic stop.  He radioed the OCU for assistance from a marked unit.

After following the Contour for a few blocks, Detective Edwards observed the vehicle slow down and pull to the side of the road, even though he had not attempted to stop the vehicle.  As he drove past the Contour, he saw that it had a flat tire.  Detective Edwards parked his vehicle "a couple of houses" in front of the Contour in an effort to avoid being noticed by the occupants of the vehicle, and waited for other OCU detectives to arrive.[2]  As he watched the vehicle, he observed three individuals, later identified as Cassie, Antoine, and Bernard Clemmons, exit the vehicle and appear to inspect the flat tire.[3]  Detective Edwards

---

[2]Antoine and Bernard Clemmons testified that they suspected Detective Edwards was a police officer when they saw him following them, and that they had discussed this with Cassie Clemmons while in the car.  However, they testified that the reason they stopped on the side of the road was because of the flat tire.

[3]It was later discovered that Antoine Clemmons, the driver of the vehicle, was Cassie Clemmons's cousin.  Bernard Clemmons, who sat in the front passenger seat, was Antoine Clemmons's uncle.

then saw Cassie Clemmons, who had been sitting in the back seat, walk around the back of the car to the passenger side, reach into his waistband, and get into the back seat behind the front passenger seat.  Detective Edwards then observed Cassie Clemmons lean forward from his sitting position and reach under the front passenger seat, as if to either hide or retrieve an object from under the front passenger seat.[4]  Detective Edwards testified that he was concerned that Cassie Clemmons may have been hiding or retrieving a weapon.[5]

At around the same time, OCU Detectives Gibbs and Yancey approached the Contour from behind.[6]  As Detective Gibbs approached in his vehicle, he saw that Antoine Clemmons had a tire jack and was in the process of replacing the flat tire.  He then saw Cassie Clemmons enter the back seat of the vehicle and reach under the front passenger seat.  Detectives Gibbs and Yancey turned on their

---

[4]While Detective Edwards testified that he saw Cassie Clemmons get into the back seat on the passenger side behind the front passenger seat, Detective Gibbs testified that as he approached the Contour from behind in his police vehicle, he saw Cassie Clemmons get into the back seat of the Contour on the driver side.  The court finds that the conflicting testimony does not undermine the overall credibility of the detectives, as their testimony was consistent in all material respects.

[5]Detective Gibbs, who also saw Cassie Clemmons lean over and reach under the front passenger seat, similarly testified that based on his training and experience, Clemmons's movements were consistent with someone who was trying to hide or retrieve weapons or drugs.

[6]According to Detective Gibbs, he was driving a marked police vehicle, but Detective Yancey was in an unmarked unit.

emergency lights, got out of their vehicles, and approached the
three men.  The detectives wore law enforcement vests and badges,
and their holstered firearms were visible.

Detective Gibbs spoke first to Cassie Clemmons, who was still
sitting in the back seat, and asked him what he was doing.
Clemmons responded that he was helping the others change the flat
tire.  Detective Gibbs asked Clemmons to step out of the car.  As
he started to question the front passenger, Bernard Clemmons,
Detective Gibbs noticed that Cassie Clemmons was acting "uneasy"
and nervous as he was talking to Detective Yancey, pacing back and
forth as if he was about to flee.  He was not answering the
detectives' questions, nor was he complying with the detectives'
instructions to keep his hands where they could see them, which
caused them to be concerned about officer safety.

Detective Edwards, who by this time had pulled up across the
street from the Contour, told Detective Gibbs that he had
previously seen Cassie Clemmons reach into his waistband area and
then reach under the front passenger seat.  The detectives
handcuffed Cassie Clemmons and moved him to the sidewalk.
Detective Edwards then questioned the driver, Antoine Clemmons.
Detective Edwards asked Antoine Clemmons why he swerved out of his
lane and almost hit the detective's vehicle.  Antoine Clemmons said
that he was depressed because the woman who had been murdered the
night before was his sister.  Detective Edwards then asked Antoine

-5-

Clemmons for consent to search the vehicle, and he told the detective that he could.  Detective Edwards immediately went to look under the front passenger seat and saw a handgun.  He informed Detective Gibbs about the firearm, at which time Detective Gibbs took photographs of the firearm and seized the weapon.[7]  The detectives discovered the firearm was stolen, and arrested Cassie Clemmons.

On July 21, 2009, a federal grand jury returned a one-count indictment charging Cassie Clemmons with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Clemmons now moves to suppress the firearm seized by the detectives from the Contour.

## II.  PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Clemmons contends that the detectives did not have probable cause or reasonable suspicion to stop the Contour, that they lacked reasonable suspicion to detain and question him and the other occupants, and that the consent to search the vehicle was obtained as a result of the unlawful detention or, alternatively, was not knowingly and voluntarily given by Antoine Clemmons.

---

[7]Antoine Clemmons testified that the detectives conducted two searches of the Contour, the first search conducted by Detective Edwards and the second search conducted by Detective Gibbs.  The court finds this to be incorrect, as Detective Edwards found the firearm immediately upon receiving consent to search from Antoine Clemmons.

Clemmons's first argument is without merit, as Antoine Clemmons stopped and pulled to the side of the road because his vehicle had a flat tire, and not as a result of any attempt by law enforcement to stop the vehicle.  Although Detective Edwards wanted to initiate a traffic stop based on what he perceived to be reckless driving, he was not able to do so because he was in an unmarked police vehicle with no emergency lights.  The fact that Detective Edwards or one of the other detectives might have stopped the Contour had it not stopped on its own is irrelevant.  See United States v. Garrett, 106 F. App'x 423, 427 (6th Cir. 2004) (stating that "[t]he fact that [officer] would have stopped Garrett, had Garrett not stopped on his own, does not make the encounter between [officer] and Garrett a traffic stop"); United States v. Perez-Sosa, 164 F.3d 1082, 1084 (8th Cir. 1998) (holding that where driver did not see trooper's flashing lights or ignored them, then pulled into a gas station and began fueling, the subsequent encounter between trooper and motorist was a consensual encounter); United States v. Taylor, 956 F.2d 572, 575 (6th Cir. 1992) (finding as irrelevant officer's testimony that he would not have allowed the suspect to "flee" because that intention was not communicated to the suspect at the time).  Thus, the initial "stop" of the vehicle does not implicate any Fourth Amendment concerns.

However, when the detectives approached the Clemmonses, the detectives drove up in three separate police vehicles (one of which

-7-

was a marked unit), engaged their emergency lights, and displayed law enforcement vests, badges, and holstered weapons. At that point, their encounter constituted an investigatory detention that had to be based on reasonable suspicion. See Garrett, 106 F. App'x at 427-28 (finding district court did not err in holding that encounter between defendant and police was no longer consensual when defendant was approached by three or four officers who flashed emergency lights and had holstered guns); United States v. Buchanon, 72 F.3d 1217, 1224 (6th Cir. 1995) (finding that flashing police lights and officer's ordering defendant to move from the road into the grass contributed to the encounter being a stop rather than a consensual encounter); United States v. Rigger, No. 3:08-CR-27, 2008 WL 5635547, at *3 (E.D. Tenn. Oct. 17, 2008) (finding that "the circumstances surrounding the officers' initial encounter with the defendant – that he was asked to step over toward the officers and that the officers had turned on their blue lights – reveal that they had detained or stopped the defendant"); cf. United States v. General, 237 F. App'x 808, 810 (4th Cir. 2007) (finding that defendant's encounter with officers was consensual in nature, as there was no evidence the officers activated their blue lights or parked their cars so as to prevent the defendant from driving off).

It is well established that the level of suspicion required to justify an investigatory stop or detention is "reasonable

suspicion." <u>Terry v. Ohio</u>, 392 U.S. 1, 3 (1968); <u>United States v.
Heath</u>, 259 F.3d 522, 528 (6th Cir. 2001).  "An investigatory stop
must be justified by some objective manifestation that the person
stopped is, or is about to be, engaged in criminal activity . . .
.  Based upon that whole picture the detaining officers must have
a particularized and objective basis for suspecting the particular
person stopped of criminal activity." <u>United States v. Cortez</u>, 449
U.S. 411, 417-18 (1981).   For purposes of determining whether
reasonable suspicion exists, the Supreme Court has instructed that
a reviewing court must consider the "totality of circumstances . .
. to see whether the detaining officer has a particularized and
objective basis for suspecting legal wrongdoing." <u>United States v.
Arvizu</u>, 534 U.S. 266, 273 (2002) (quotation marks omitted).   The
Court further instructed that in considering all the circumstances,
the  question  is  not  whether  there  is  a  possible  innocent
explanation for each of the factors, but whether all of them taken
together give rise to reasonable suspicion that criminal activity
may be afoot.  <u>Id.</u> at 274-75.

Although the Supreme Court has "deliberately avoided reducing
[the  reasonable  suspicion  analysis]  to  a  'neat  set  of  legal
rules,'" there are several frequently recurring factors that may
aid  in  determining  whether  an  officer  possessed  the  requisite
reasonable suspicion to conduct a <u>Terry</u> stop.  <u>Id.</u> (quoting <u>Ornelas
v. United States</u>, 517 U.S. 690, 696 (1996)).  "The most frequently

-9-

recurring factors utilized in the Sixth Circuit's analysis include: (1) nervous/evasive behavior, (2) furtive movements made in response to police presence, (3) the speed of a suspect's movements, (4) presence in a high-crime area, and (5) the time of day." United States v. Lewis, No. 08-20028, 2008 WL 4849910, at *3 (W.D. Tenn. Nov. 6, 2008) (collecting cases).

In this case, the OCU detectives were briefed on the morning of July 1 that a woman had been murdered the night before in the Browning Avenue area, and they were instructed to saturate that area and to be on the lookout for any suspicious activity. Detectives Edwards and Gibbs knew the Browning Avenue area to be a high crime area, especially for firearms-related crimes. Detective Edwards's attention was initially drawn to the Contour because it almost collided with his car and continued to swerve in and out of its driving lane. While Detective Edwards was waiting for other units to arrive, he saw Cassie Clemmons reach toward his waistband, get into the back seat of the Contour, and appear to reach under the front passenger seat. Although Detective Gibbs did not see Clemmons reach toward his waistband, he did see Clemmons reach under the front passenger seat. Detective Gibbs also testified that he thought it was suspicious that Cassie Clemmons would get back into the car while Antoine Clemmons had a tire jack and was preparing to replace the flat tire. Based on these facts, the court finds that the detectives had reasonable suspicion to conduct

-10-

an investigatory detention of the Clemmonses. See United States v. Pearce, 531 F.3d 374, 382 (6th Cir. 2008) (finding reasonable suspicion where officer entered known high-crime area in marked police cruiser, observed defendant exit vehicle, glance towards him, hunch over, place his right hand in the small of his back, and start backing away); United States v. Wilson, 252 F. App'x 43, 44 (6th Cir. 2007) (finding reasonable suspicion where officer approached defendant's vehicle and saw defendant turn in the seat and appear to hide something); United States v. Graham, 483 F.3d 431, 441 (6th Cir. 2007) (finding reasonable suspicion where officers received a tip that defendant might be armed and observed the defendant dip with his right shoulder toward the floor of his vehicle as if he was placing something under the seat); United States v. Brock, No. 07-20400-STA, 2008 WL 4279623, at *4 (W.D. Tenn. Sept. 12, 2008) (finding reasonable suspicion where officer encountered defendant in a high-crime area, acting nervously and evasively during their consensual encounter, and making a furtive movement toward the ankle of his pants).

Moreover, when the detectives initially questioned Cassie Clemmons, he exhibited nervous and evasive behavior, paced back and forth as if he was about to flee, and was not compliant with the detectives' requests that he keep his hands where they could see them, which caused the detectives to be concerned about their safety. Thus, Clemmons's behavior during the detention added to

-11-

the detectives' suspicion that criminal activity was afoot and justified their continued detention and questioning of the Clemmonses. See United States v. Caruthers, 458 F.3d 459, 465 (6th Cir. 2006) (finding reasonable suspicion where officer observed defendant flee and make furtive movements when approached by police in a high-crime area); United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (finding reasonable suspicion when officers observed that defendant was nervous and avoided questioning by attempting to leave). The detectives' decision to place handcuffs on Cassie Clemmons while they talked with the other two occupants was also reasonable under the circumstances, as they were concerned that Cassie Clemmons might attempt to flee or possibly reach for a weapon in the vehicle. See United States v. Jacob, 377 F.3d 573, 579-80 (6th Cir. 2004) (finding that investigators' decision to order the defendant out of the vehicle, handcuff him, and place him in police vehicle was reasonable during Terry stop, and that the use of physical restraints did not elevate the investigatory stop to an arrest); United States v. Dotson, 49 F.3d 227, 230-31 (6th Cir. 1995) (finding that officer's use of physical force to restrain defendant who attempted to flee from traffic stop was reasonable); United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987) (finding that since a Terry stop is involuntary, use of force to stop a suspect from fleeing is reasonable); United States v. Allen, No. 3:04cr123, 2005 WL 5574429, at *5 (S.D. Ohio

Mar. 15, 2005) (finding that detaining defendants in the rear of police cruiser while officers conducted further investigation was reasonable).

Finally, the detectives' search of the Contour and seizure of the firearm did not violate Cassie Clemmons's Fourth Amendment rights, as the detectives obtained consent to search from Antoine Clemmons, the vehicle's driver. "If an officer obtains consent to search, a warrantless search does not offend the Constitution." United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). "[A] search is not unreasonable if an individual with a privacy interest in the item to be searched gives voluntary consent." United States v. McCauley, 548 F.3d 440, 446 (6th Cir. 2008) (citing Bustamonte, 412 U.S. at 219). "Valid consent may be provided not only by the defendant but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" Id. (quoting United States v. Matlock, 415 U.S. 164, 171 (1974)). Antoine Clemmons, as the driver, had the authority to give the detectives consent to search the vehicle. Matlock, 415 U.S. at 171; see also United States v. Robinson, No. 1:07-CR-1, 2007 WL 2138635, at *4

-13-

n.5 (E.D. Tenn. July 23, 2007) (stating that driver of vehicle had authority to consent to search) (citing Matlock, 415 U.S. at 171); United States v. Reeves, No. 1:06:CR:291, 2007 WL 1238885, at *3 (W.D. Mich. Apr. 27, 2007) (same).  As clearly demonstrated by Antoine Clemmons's testimony, as well as by the testimony of Detective Edwards, his consent was knowingly and voluntarily given. Moon, 513 F.3d at 537 (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)); see also United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977).  Antoine Clemmons was not placed in handcuffs when questioned by Detective Edwards, was not coerced or threatened in any way, and according to his own testimony, was not even aware that there was a gun in the vehicle.  Indeed, he testified that he was treated fairly by the detectives and did not realize Cassie Clemmons was in handcuffs until after the detectives found the gun, which further demonstrates that his consent was knowing and voluntary.

### III.  RECOMMENDATION

For the reasons above, the court recommends that the motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

February 5, 2010
Date

-14-

NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.